UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FREDERICK TED SPENCER,

              Petitioner,                   CASE NO. 09-13362

v.                                 HONORABLE PATRICK J. DUGGAN

DEBRA SCUTT,

              Respondent.

_____/

## OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. §

2254.  Petitioner Frederick Ted Spencer, a Michigan Department of Corrections prisoner,

is currently housed at the G. Robert Cotton Correctional Facility in Jackson, Michigan.

He is serving a life sentence for felony murder and a two to ten year sentence for arson of

a dwelling house and preparation to burn property over $20,000 in connection with a fire

at his home in Shepherd, Michigan on January 30, 2000.  On March 3, 2006, a jury

convicted Spencer of starting this fire, which caused the death of Spencer's then-

girlfriend, Kathy Sytek.  Spencer was also charged with arson in connection with a

second fire at his home on February 18, 2000, but was found not guilty.  Spencer's

petition raises a single claim of ineffective assistance of trial counsel, based on his trial

counsel's failure to move to exclude statements he made to state arson investigator while

in the hospital recovering from severe injuries sustained in the January fire.  For the

reasons below, the Court grants a conditional writ of habeas corpus.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The facts are set forth in the opinion of the Michigan Court of Appeals denying

Spencer's direct appeal:

> Defendant Fred Spencer owned an old farmhouse on Deerfield Road
> outside Shepherd, Michigan. In 1999, Kathy Sytek, who was unemployed
> and had been forced to move from her apartment, began living rent-free in
> defendant's home. Defendant and Kathy began a relationship soon
> thereafter, and defendant supported Kathy financially. Both defendant and
> Kathy were alcoholics. Although some witnesses claimed that Kathy and
> defendant had a good relationship, others testified that their relationship
> became volatile when they drank.
>
> Around 8:45 p.m. on January 30, 2000, Tracy Carpenter[1] was driving
> west on Deerfield Road when she noticed that defendant's house was on
> fire and called 911. Soon after she began talking to the dispatcher,
> defendant ran toward her, distraught, and told her that his "woman" was
> inside the burning house. A few minutes later, defendant ran back to the
> house and entered the front porch, collapsing just inside the door.
> Firefighters arriving at the scene soon thereafter rescued defendant. He was
> transported to Saginaw St. Mary's Hospital and admitted to the burn trauma
> intensive care unit. Defendant received severe burns to his face and arms,
> requiring skin grafts, and was hospitalized for two-and-a-half weeks.
>
> Other firefighters at the scene eventually put out the fire. They discovered
> Kathy's body in the dining room, lying facedown in a fetal position in front
> of a couch. An autopsy revealed that she died from asphyxia caused by
> carbon monoxide poisoning as a result of the fire. Her blood alcohol
> concentration at the time of death was 0.30 grams of alcohol per 100
> milliliters of blood. Greg Proudfoot, a detective sergeant and state fire
> marshal for the Fire Marshal Division of the Michigan State Police,
> investigated the cause and origin of the January 30 fire. He determined that

---

[1] In January 2000, Tracy's last name was Carpenter.  At the time of trial, Tracy's last
name was Castellon. (2/15/06 Trial Tr. at 195.)  The Court shall refer to this witness as
Tracy to avoid confusion.

> defendant started separate fires in the basement and garage of the house,
> and that the fire that he started in the garage destroyed the house.

*People v. Spencer,* No. 271884, 2007 Mich. App. LEXIS 2599, at *1-3 (Mich. Ct. App.

Nov. 20, 2007) (per curiam) (unpublished).

Spencer was admitted to the hospital on January 30, 2000 with serious injuries and

stayed there for 19 days following the fire.  A second fire occurred on February 18, 2000,

within a few hours of Spencer's release from the hospital.

At Spencer's trial, the prosecution introduced two audio-taped interviews taken

from Spencer by Proudfoot, the State's arson investigator, while Spencer was in the

hospital recovering from the January fire.  The interviews, each over an hour long, took

place on February 10 and 12, 2000.  (Pet., Apps. E, F (interview transcripts).)  The

prosecution used Spencer's statements to highlight inconsistencies between Spencer's

account of the fire and the physical evidence found by Proudfoot.

The jury convicted Spencer of one count of arson (preparation to burn property) in

violation of Michigan Compiled Laws § 750.77(1)(d)(i), arising from the fire in his home

on January 30, 2000, and one count of felony murder, *id.* § 750.316(b), arising from the

death of Spencer's girlfriend in that fire.  The jury found Spencer not guilty of arson to

real property as to the February 18, 2000 fire.

Following his conviction, but before the Isabella County trial court imposed a

sentence, Spencer's trial counsel moved for a directed verdict of acquittal and new trial

on the grounds of sufficiency of the evidence and that the verdict was against the great

weight of the evidence.  In response to a request by the trial court to supplement his

3

motion by raising all issues that could be raised on appeal, trial counsel supplemented his initial motion and raised several additional claims, including his own ineffective assistance for failure to seek suppression of the statements Spencer made to Proudfoot while in the hospital on voluntariness grounds.  The trial court held oral argument on the post-trial motions on April 18, 2006.  (4/18/06 Tr. of Mot. Hrg.)  The trial court denied this motion on June 16, 2006.  Op. & Order, *People v. Spencer*, No. 05-59-FC (Isabella Cnty. Tr. Ct. June 16, 2006) (attached to Pet. as App. D).  Spencer was sentenced to life in prison on July 12, 2006.

Spencer filed a claim of appeal with the Michigan Court of Appeals on July 24, 2006, raising six claims: (1) insufficiency of the evidence/verdict against the great weight of the evidence; (2) ineffective assistance of counsel for failure to move to suppress as involuntary two statements taken from Spencer while he was in the hospital; (3) erroneous admission of expert testimony of fire investigator; (4) erroneous admission of threatening remark; (5) prosecutorial misconduct; and (6) five-year delay between offence and arrest denied Petitioner due process of law.  The Michigan Court of Appeals affirmed Spencer's convictions in an unpublished, *per curiam* opinion.  *People v. Spencer*, No. 271884, 2007 Mich. App. LEXIS 2599 (Mich. App. Nov. 20, 2007).  The Michigan Supreme Court denied leave to appeal on March 24, 2008.  *People v. Spencer*, No. 135444, 2008 Mich. LEXIS 511 (Mich. Mar. 24, 2008).  Spencer's *pro per* motion for reconsideration was denied by the Michigan Supreme Court on May 27, 2008. Spencer did not file a petition for the writ of certiorari and his conviction became final

upon the expiration of the filing period.  Spencer then filed this petition for writ of habeas corpus on August 25, 2009.

## II.    STANDARD OF REVIEW

Spencer's petition is subject to review pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA").  Pub. L. No. 104-132, 110 Stat. 1214.  In order to grant relief, this Court must conclude that the Michigan court's decision "with respect to any claim that was adjudicated on the merits in State court proceedings" was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[]" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The Supreme Court has fleshed out the meanings of the two clauses contained in 28 U.S.C. § 2254(d)(1).  "A state-court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent."  *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000) (alterations in original) (internal quotation marks omitted)).  Alternatively, "[i]f the state court identifies the correct governing legal principle . . . , habeas relief is available under the unreasonable application clause if the state court unreasonably applies that principle to the facts of the prisoner's case or unreasonably extends or unreasonably refuses to

5

extend a legal principle from the Supreme Court precedent to a new context." *Akins v. Easterling*, 648 F.3d 380, 385 (6th Cir. 2011) (internal quotation marks and alterations omitted). A federal court may not find a state court's application of Supreme Court precedent unreasonable if it is merely "incorrect or erroneous. [Rather, t]he state court's application must have been 'objectively unreasonable.'" *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527, 2535 (2003) (citations omitted).

As suggested by the above-quoted language, AEDPA's standard of review is "difficult to meet . . . [as it is a] highly deferential standard." *Cullen v. Pinholster*, 563 U.S. __, __, 131 S. Ct. 1388, 1398 (2011). In fact, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. __, __, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2150 (2004) (per curiam)).

### III.   ANALYSIS

The sole claim in Spencer's pending habeas petition is that he was denied his constitutional right to the effective assistance of counsel when his trial counsel failed to file a motion to suppress the hospital-bed statements Spencer made while recovering from severe injuries. Spencer's position is that the statements should have been excluded as involuntary, that his trial counsel failed to file a suppression motion because he misunderstood the applicable law, that a motion to suppress would have succeeded, and that he suffered prejudice as a result of his counsel's inaction. For the reasons explored more fully below, the Court concludes that the state courts' *Strickland* determinations

6

were contrary to and involved unreasonable applications of established Supreme Court

precedent.  The Court therefore conditionally grants Spencer's petition for writ of habeas

corpus.

## A.      Ineffective Assistance of Counsel Standard

The Sixth Amendment to the United States Constitution guarantees criminal

defendants "the right to the effective assistance of counsel."  *Strickland v. Washington*,

466 U.S. 668, 686, 104 S. Ct. 2053, 2063 (1984) (citation and internal quotation marks

omitted).  This right has been deemed a "bedrock principle in our justice system[,]" one

that serves as "the [very] foundation for our adversary system."  *Martinez v. Ryan*, 565

U.S. __, __, 132 S. Ct. 1309, 1317 (2012) ("Defense counsel tests the prosecution's case

to ensure that the proceedings serve the function of adjudicating guilt or innocence, while

protecting the rights of the person charged."); *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.

Ct. 55, 64 (1932) ("Left without the aid of counsel [a defendant] may be . . . convicted

upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible.

. . . Without [the guiding hand of counsel], though [a defendant] may not be guilty, he

faces the danger of conviction because he does not know how to establish his

innocence.").  The effectiveness of counsel rests upon the now-familiar two-component

performance and prejudice framework first enunciated in *Strickland*:

> First, the defendant must show that counsel's performance
> was deficient.  This requires showing that counsel made
> errors so serious that counsel was not functioning as the
> "counsel" guaranteed by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance
> prejudiced the defense.  This requires showing that counsel's

7

> errors were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

To demonstrate counsel's deficient performance, Spencer "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. at 2064. Objective reasonableness is defined by reference to prevailing professional norms. *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997) (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065). To escape the "distorting effects of hindsight," counsel's performance must be assessed according to "counsel's perspective at the time[]" of the challenged conduct. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Given the inherent difficulty in making this retrospective determination, the Court must "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.*; *see also Johnson v. Bell*, 525 F.3d 466, 487 (6th Cir. 2008) ("Our review of counsel's performance is highly deferential and counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.") (internal quotation marks omitted). A defendant or habeas petitioner bears the burden of overcoming the presumption that counsel's challenged conduct constituted sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).

If successful in demonstrating counsel's deficient performance, a defendant or habeas petitioner must establish prejudice, which requires "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

8

proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068.  A reasonable

probability is "'a probability sufficient to undermine confidence in the outcome' –

certainty of a different outcome is not required." *Rayborn v. United States*, No. 10-5134,

2012 U.S. App. LEXIS 14998, at *19 (6th Cir. July 20, 2012) (unpublished) (citing

*Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).  There must, however, be "a substantial,

not just conceivable, likelihood of a different result." *Foust v. Houk*, 655 F.3d 524, 539

(6th Cir. 2011) (quoting *Pinholster*, 563 U.S. at __, 131 S. Ct. at 1403).

**B.**     **Ineffective Assistance of Counsel on Habeas Review**

        In the instant case, there is no dispute that Spencer raised the same ineffective

assistance of counsel claim that he now advances before both the Michigan trial court and

the Michigan Court of Appeals.  Importantly, when confronted with a case containing the

procedural posture presented here – a federal district court reviewing an ineffective

assistance of counsel claim adjudicated on the merits and denied by a state court by way

of federal habeas relief pursuant to 28 U.S.C. § 2254(d) – the Court must not conflate the

"highly deferential" standards independently created by *Strickland* and § 2254(d).  *See*

*Harrington*, 562 U.S. at __, 131 S. Ct. 770, 788 (2011) (citations omitted).  Instead,

"when the two [standards] apply in tandem," a District Court must apply a "doubly"

deferential standard. *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct.

1411, 1420 (2009)).  Thus, the Court's task today is not to consider *ab initio* whether

Spencer's counsel satisfied the requirements of *Strickland*; rather, the Court must decide

whether the state courts' *Strickland* determinations were "contrary to, or involved an

unreasonable application[s] of, clearly established Federal law[] . . . ."  28 U.S.C. § 2254(d)(1).

## IV.   APPLICATION

When evaluating claims adjudicated on the merits, such as Spencer's ineffective assistance claim, the Sixth Circuit has indicated that district courts should review the decision of, and give appropriate AEDPA deference to, "the last state court to issue a reasoned opinion on the issue."  *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010) (citing *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005)); *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) (citation omitted).  In the instant case, the Michigan Court of Appeals was the last state court to issue a reasoned opinion on Spencer's ineffective assistance of counsel claim and the Court begins by analyzing this opinion.  However, because AEDPA deference applies even "where the state court's reasoning is flawed or abbreviated[,]" which the Court finds this to be the case here, *see infra*, the Court then examines the decision issued by the Michigan trial court to determine whether the ultimate conclusion reached by both Michigan courts – that counsel was not deficient – was a proper and reasonable application of Supreme Court precedent.  *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (citing *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (explaining that the "unreasonable application" test under AEDPA should be on the ultimate legal conclusion as opposed to the court's reasoning)); *see also Pinholster*, 563 U.S. at __, 131 S. Ct. at 1407 (noting that courts must "affirmatively entertain the range of possible reasons petitioner's counsel may have had for proceeding as [he] did") (internal quotation marks omitted).

10

**A.    Review of the Michigan State Court Decisions**

Both state courts determined that Spencer's trial counsel was constitutionally-sufficient and disposed of Spencer's *Strickland* claim under the deficient-performance prong.  As such, this prong was adjudicated on the merits and the Court reviews this determination through the lens of AEDPA deference.  *See, e.g.*, *Wiggins*, 539 U.S. at 534, 123 S. Ct. at 2542.  However, because neither state court assessed prejudice, the Court reviews this prong de novo.  *Id.*

**1.    *Michigan Court of Appeals' Decision on Performance Prong***

The Michigan Court of Appeals rejected Spencer's contention that the hospital statements – made while he was in an intensive care burn trauma unit recovering from severe lung injuries and burns – should have been excluded on voluntariness grounds, holding that "the admission of his statements did not violate his due process rights." *Spencer*, No. 271884, 2007 Mich. App. LEXIS 2599, at *18.  After noting that "[Spencer] did not confess to anything in either interrogation" but rather "maintained throughout . . . that he did not start the January 30 fire[,]" the court explained that "where the defendant's statements were admissions of fact, rather than a confession of guilt, no finding of voluntariness is necessary."  *Id.* at *18, *20 (citing *People v. Gist*, 190 Mich. App. 670, 671, 476 N.W.2d 485, 486 (1991)).  Based on the belief that the statements could not be suppressed because they were not confessions, the Michigan Court of Appeals went on to reject Spencer's ineffective assistance claim, remarking that a finding of counsel's deficiency "cannot be predicated on the failure to make a frivolous or meritless motion."  *Id*. at *21 (quoting *People v. Riley*, 468 Mich. 135, 142, 659 N.W.2d

11

611, 615 (2003)).  In other words, the Michigan Court of Appeals determined that counsel performed reasonably.

The Michigan Court of Appeals' holding that the admission of a defendant's involuntary statements cannot violate the United States Constitution where the defendant did not directly confess to the offense charged is contrary to Supreme Court precedent. The constitutional prohibition on the admission of involuntary statements includes not only "direct confessions," but also the "refusal to confess," statements that point the finger at others, and other statements the prosecution seeks to admit because of its tendency to implicate the defendant.  *See, e.g.*, *Bram v. United States*, 168 U.S. 532, 541-42, 18 S. Ct. 183, 186 (1897); *Miranda v. Arizona*, 384 U.S. 436, 476-77, 86 S. Ct. 1602, 1629 (1966) ("[N]o distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'"; "[i]f a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution."); *Rhode Island v. Innis*, 446 U.S. 291, 301 n.5, 100 S. Ct. 1682, 1690 n.5 (1980) ("[S]tatements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication" and are "incriminating in any meaningful sense of the word") (quoting *Miranda*, 384 U.S. at 477, 86 S. Ct. at 1629).

This Court finds that because the appellate court's opinion was rooted in an erroneous interpretation of what constitutes a confession subject to due process analysis, its ultimate conclusion that trial counsel was not constitutionally ineffective in failing to move to suppress the involuntary statements was contrary to and involved an

12

unreasonable application of *Strickland*.  The Michigan Court of Appeals never addressed the performance prong as it did not ask whether a reasonably competent attorney – defined with reference to prevailing professional norms – would have sought to exclude Spencer's statements as involuntary.  Erroneously concluding that such a motion would be frivolous, the state court simply dismissed the notion that the statements were subject to voluntariness analysis.[2]  *Id.* at *18.

## 2.   *Michigan Trial Court's Decision on Performance Prong*

In ruling on Spencer's post-trial motion for a directed verdict of acquittal and new trial, the Michigan trial court adjudicated Spencer's ineffective assistance claim on the merits.  The trial court indicated that Spencer's attorney "admitted" at oral argument "that it was his trial strategy not to suppress [the hospital-bed] statements."[3]  Op. & Order, *Spencer*, No. 05-59-FC, at 6. Explaining that "[c]ourts should reluctantly interfere with sound trial strategy[,]" the court concluded that counsel's "trial strategy was sound[,]" and although it "may have been less than successful, it did not subject [Spencer] to a miscarriage of justice."  *Id.* at 6-7.

---

[2] The Court notes that the State does not defend the position of the Michigan Court of Appeals. (Answer 33-34, 34 n.45.)  Rather, the State asks this Court to deny Spencer's habeas petition for the same reason promulgated by the Michigan trial court, arguing that Spencer's Spencer's trial counsel was not ineffective because it was his trial strategy to admit the statements.  (*Id.* at 37-40.)

[3] This case involves the unusual situation in which trial counsel argued for his own ineffectiveness.  Trial counsel moved for a directed verdict and new trial on March 20, 2006 on the grounds of sufficiency of the evidence and whether the verdict was against the great weight of the evidence.  In response to a request by the trial court to supplement his motion by raising all issues that could be raised on appeal, trial counsel supplemented his initial motion and raised several additional claims, including his own ineffective assistance.

A review of the record shows that the state trial court's ultimate conclusion is problematic for two reasons: (a) counsel did not admit to the tactical decision described by the court; and (b) even if counsel's actions were strategic, they could not be considered objectively reasonable, therefore rendering the trial court's determination that the strategy was sound an unreasonable application of *Strickland*. These issues are addressed in turn.

   a.   *Counsel's "Admitted" Trial Strategy*

The trial court's determination that counsel "admitted that it was his trial strategy not to suppress [the] statements[]" is a factual finding. *Id.* at 6. AEDPA mandates a presumption that a state court's findings of fact are correct unless the habeas petitioner rebuts, by clear and convincing evidence, this presumption. 28 U.S.C. § 2254(e)(1). Additionally, pursuant to 28 U.S.C. § 2254(d)(2), a court should not overturn "a decision adjudicated on the merits in a state court and based on a factual determination" unless the state court's decision is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Tremble v. Burt*, No. 10-2573, 2012 U.S. App. LEXIS 18683, at *17 (6th Cir. Aug. 31, 2012) (unpublished) (citing *McKinney v. Ludwick*, 649 F.3d 484, 488 (6th Cir. 2011) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003))).

The trial court's assertion that counsel admitted that his strategy involved allowing Spencer's statements to get before the jury so that he could demonstrate the ineptitude of the state arson investigator is rather curious. Counsel did say "I'm not objecting to [Spencer's statements] even though I could have brought a motion because of the fact

14

that they were being given while the man was under the influence of drugs[]" at trial,

(2/16/06 Trial Tr. at 16); however his post-verdict brief and oral argument belie a finding

that the failure to file a suppression motion was strategic.

During the post-trial motion oral argument, counsel candidly admitted that in spite

of his concern "about the fact that [the statements] were given in the hospital at a time

when Mr. Spencer was hooked up to IVs and not able to leave[,]" "it was our belief that,

in all likelihood, we would not be able to keep out the statements of February 10th and

February 12th out . . . as being involuntary." (4/18/06 Tr. of Mot. Hrg. at 17, 18.)

Counsel explained further that he could not prevail on a suppression motion because

"there were no admissions, there was no statement at all that would amount to anything

like a confession, not even an acknowledgement that there was a motive." *Id.* at 17. [4]

The trial court acknowledged this explanation, stating "[a]s a reason for not bringing a

motion, Defendant's trial counsel argues that he believed that Defendant's statements

could not be excluded from evidence because they were neither admissions nor

confessions.  This belief is in error."  Op. & Order, *Spencer*, No. 05-59-FC, at 6.

However, in the very next paragraph, the trial court proceeded to explain that Spencer's

trial counsel admitted that the failure to move for suppression was strategic.  *Id.*  These

findings are mutually exclusive: counsel could not have made an informed strategic

---

[4] In his state court post-conviction motion appeal brief, Spencer's appellate counsel
explained "Defendant's Counsel initially did not believe that Defendant's statements
could be excluded from evidence since such statements did not amount to admissions nor
were such statements a confession."  (Pet.'s Br. on Appeal, Mich. Ct. Apps. No. 271844,
at 34.)   In short, the failure to move for suppression "was based on a misapprehension of
the law, not strategy."  (*Id.*)

decision to allow admission of the statements if he erroneously believed the statements could not be excluded as involuntary. *Noble v. Kelly*, 89 F. Supp. 2d 443, 463 (S.D.N.Y. 2000) ("Errors caused by counsel's ignorance of the law are errors that run afoul of the objective standard of reasonableness.") (citing *Kimmelman v. Morrison*, 477 U.S. 365, 385, 106 S. Ct. 2574, 2588 (1986) (rejecting argument that counsel's errors were strategic choices because they were based on ignorance of the law)), *aff'd*, 246 F.3d 93 (2d Cir. 2001); *cf. Strickland*, 466 U.S. at 680, 104 S. Ct. at 2061 ("[T]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options.").

Because the state court record evidences counsel's actual reasoning for not seeking to suppress Spencer's statements, the Court believes that the state trial court's determination that the failure to move for suppression constituted sound trial strategy was "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Tremble*, No. 10-2573, 2012 U.S. App. LEXIS 18683, at *17 (citations omitted); *cf. Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066 (noting that counsel's conduct is judged "on the facts of the particular case, viewed as of the time of counsel's conduct"). In deeming the failure to move for suppression strategic, the state trial court appears to have engaged in the type of "*post-hoc* rationalization of counsel's conduct" the Supreme Court disavowed in *Wiggins*. 539 U.S. at 526-27, 123 S. Ct. at 2538.

   b.      *The Failure to Move for Suppression Was Not Sound Strategy*

   As explained above, the Court believes that the evidence before the state court

negates a finding that counsel's conduct was strategic.  However, even if the failure to

move for suppression could be deemed strategic, merely "labeling a trial tactic 'strategic'

does not insulate it, perforce, from *Strickland* review."  *Rayborn*, No. 10-5134, 2010 U.S.

App. LEXIS 14998, at *20-21 (citing *Lovett v. Foltz*, 884 F.2d 579, at *11 (6th Cir. Sept.

5, 1989) (unpublished) (per curiam) ("[T]he label 'strategy' is not a blanket justification

for conduct which otherwise amounts to ineffective assistance of counsel.")).  While

*Strickland* creates a "strong presumption that counsel's decisions are based on sound trial

strategy, '[t]he trial strategy itself must be objectively reasonable.'"  *Keith v. Mitchell*,

455 F.3d 662, 676 (6th Cir. 2006) (quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.

2001)); *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 1037 (2000).  In light

of this reasonableness requirement, "even deliberate trial tactics may constitute

ineffective assistance of counsel if they fall outside the wide range of professionally

competent assistance."  *Id.* at *21 (citing *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir.

1984) (internal citation omitted)); *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir.

1974) ("[D]efense strategy and tactics which lawyers of ordinary training and skill in the

criminal law would not consider competent deny a criminal defendant the effective

assistance of counsel, if some other action would have better protected a defendant and

was reasonably foreseeable as such before trial.").

   In assessing the reasonableness of a purported strategy, courts may look to the

"[p]revailing norms of practice as reflected in American Bar Association standards . . .

for Criminal Justice. . . ."  *Byrd v. Trombley*, 352 F. App'x 6, 9 (6th Cir. 2009)

(unpublished) (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065); *Franklin v.

Anderson*, 434 F.3d 412, 429 (6th Cir. 2006)).   Standard 4-3.6 of the ABA Standards for

Criminal Justice Relating to the Defense Function provides: "Many important rights of

the accused can be protected and preserved only by prompt legal action.  Defense counsel

should . . . take all necessary action to vindicate such rights[,]" including "moving to

suppress illegally obtained evidence[.]"  ABA Standards for Criminal Justice 4-3.6 (3d

ed. 1993) ("Prompt Action to Protect the Accused").  The commentary explains that

counsel must "promptly undertake whatever legal research is necessary to assure

vindication of his or her client's rights."  *Id.*  These professional standards lend support

the idea that a "strategy" predicated upon "[e]rrors caused by counsel's ignorance of the

law[,]" such as counsel's admittedly erroneous beliefs in the instant action, "are errors

that run afoul of the objective standard of reasonableness[]"*Strickland* requires.  *Noble v.

Kelly*, 89 F. Supp. 2d at 463, *aff'd*, 246 F.3d 93; *see also Lovett*, 884 F.2d at *11-12

(holding that counsel's performance fell below a reasonable level of professional

competence based in part on counsel's explanation that his failure to object to the

admission of defendant's prior sentences was based on ignorance of the law).

   In the instant case, Spencer's counsel failed to comprehend that his client's

statements were subject to suppression.  Had counsel conducted legal research, he would

have learned that admissions of fact are subject to voluntariness analysis.  *See* cases cited

*supra* p. 12.  The failure to investigate the law was unreasonable.  Moreover, Spencer's

trial counsel could not have made a reasonable professional judgment to stipulate to the

18

admission of Spencer's statements while operating under the incorrect belief that the statements could not be suppressed. In other words, trial counsel could not make an informed tactical decision without first understanding the rules of the game. *Strickland*, 466 U.S. at 680, 104 S. Ct. at 2061 ("[T]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options."). Insofar as misapprehension of the law governing voluntariness was not objectively reasonable, it constituted deficient performance under the first prong of *Strickland*. *Cf. McCalvin v. Yukins*, 444 F.3d 713, 725 (6th Cir. 2006) (Cole, J., dissenting) ("Although a failure to file a suppression motion does not constitute *per se* ineffective assistance of counsel, the decision must reflect a sound trial strategy and not counsel's mistaken understanding of the law.") (citing *Kimmelman*, 477 U.S. at 385, 106 S. Ct. at 2588 (1986)).

In elaborating its belief that Spencer's counsel made a strategic decision, the trial court explained that "[s]howing to the jury that Sgt. Proudfoot would question [Spencer] while he was in the hospital and while on heavy medication tracked with [counsel's] defense theme of incompetent police investigation." Op. & Order, *Spencer*, No. 05-59-FC, at 6; (*see generally* 2/22/06 Trial Tr. at 50-105 (trial counsel's cross-examination of Proudfoot).) As explained, however, the Court is of the opinion that counsel's error of law negates a finding that the failure to seek suppression was part of a sound trial strategy. The fact that Spencer's counsel hoped to mitigate the losses stemming from his mistaken beliefs regarding the admissibility of the statements did not transform counsel's

19

critical legal error into a reasonable strategic decision.  Strategy did not motivate counsel's failure to file a suppression motion; rather, the motion was not filed because counsel misunderstood the law.  The state court's conclusion to the contrary "resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of [his] deliberations prior to" making his decision.  *Wiggins*, 539 U.S. at 526-27, 123 S. Ct. at 2538; *see also Harrington*, 562 U.S. at __, 131 S. Ct. at 790 ("[C]ourts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions[.]") (quotation omitted).

The State contends that Spencer's trial counsel's strategic stipulation to the admission of the statements allowed counsel to get Spencer's exculpatory denials before the jury without subjecting Spencer to cross-examination.  Similarly, the State argues that counsel wanted to use the statements to demonstrate the haphazard nature of the investigation.  (Answer at 38-39.)  Even if these purported justifications were counsel's reasons for acquiescing to admission of the statements, no reasonable attorney assessing the evidence against Spencer before trial would have failed to discern how catastrophic the statements would be to Spencer's defense in an arson case built entirely upon circumstantial evidence.  As in *Arizona v. Fulminate*, "[a]bsent the confessions, it is unlikely that [Spencer] would have been prosecuted at all, because the physical evidence from the scene and other circumstantial evidence would have [likely] been insufficient to convict." 499 U.S. 279, 297, 111 S. Ct. 1246, 1258 (1991).  Given the State's repeated reliance on Spencer's statements throughout the trial, it is hard to envision any court finding that counsel's decision to allow the jury to hear the statements constituted sound

20

trial strategy under *Strickland*.  Not only did counsel fail to recognize the merit of a

suppression motion, but counsel handed the prosecution excludable evidence that would

predictably become the State's best means of persuading the jury and the centerpiece of

the State's case.

     In sum, Spencer's counsel did not act strategically in failing to move for

suppression; rather, he admittedly made a discrete error of law and then, based on this

misapprehension, set out to contain the inevitable damage from the admission of the

statements.  It cannot be reasonably argued that Spencer's attorney satisfied the standard

of representation guaranteed by the Sixth Amendment.  The state trial court unreasonably

applied *Strickland*.

**3.     Summary of State Court Decisions on Strickland's Performance Prong**

     The Michigan Court of Appeals denied Spencer's ineffective assistance claim

based on an erroneous interpretation of the law of voluntariness.  The state trial court, on

the other hand, did not make the same error.  The trial court concluded that Spencer's

counsel was not ineffective because the failure to move for suppression was part of his

sound trial strategy.  As discussed above, the state court decisions were either "contrary

to, or involved unreasonable application[s] of" Supreme Court precedent.   28 U.S.C. §

2254(d)(1).  This Court finds that counsel's erroneous interpretation of the law of

voluntariness precludes a finding that Spencer's trial counsel acted strategically and

supports a finding that counsel rendered a deficient performance.  This finding requires

the Court to proceed to *Strickland*'s second prong to determine whether counsel's

conduct "so undermined the proper functioning of the adversarial process that the trial

21

cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064.

## B.   Prejudice Analysis

In adjudicating and denying Spencer's ineffective assistance claim, both Michigan courts relied solely on *Strickland*'s deficient performance prong.   Because neither state court addressed the merits of Spencer's claim of prejudice, the Court reviews this prong *de novo*.   *See, e.g.*, *Wiggins*, 539 U.S. at 534, 123 S. Ct. at 2542 (applying de novo review to portion of ineffective assistance of counsel claim not decided by the state courts); *Rompilla v. Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 2467 (2005) (reviewing prejudice de novo when state courts denied claim entirely on deficiency) (citation omitted); *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 452 (2009) (per curiam) (reviewing deficiency de novo when state court denied claim entirely on prejudice) (citation omitted); *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012) ("When a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court.  The unadjudicated prong is reviewed de novo."); *cf. McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (explaining when a state court does not address the merits of a claim "there are simply no results, let alone reasoning, to which [the habeas] court can defer").

*Strickland*'s prejudice component requires Spencer to demonstrate that his counsel's conduct prejudiced his defense; that is, Spencer must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

Given the posture of the case, Spencer must show that the motion he is faulting his trial

counsel for not having filed should have been granted – that is, he must show that the

statements were involuntary, should have been suppressed, and that had they been

suppressed, the outcome at trial would have differed.  *Cf. McCalvin*, 444 F.3d at 722

(because petitioner could not show that her motion to suppress would have succeeded had

it been timely filed, petitioner could not demonstrate the prejudice required to prevail on

an ineffective assistance of counsel claim); *Gaffney v. Ludwick*, No. 08-13462, 2010 U.S.

Dist. LEXIS 61541, at *11-12 (E.D. Mich. May 18, 2010) (R & R) (unpublished) ("To be

entitled to habeas relief on [petitioner's claim that counsel was ineffective for failing to

challenge the voluntariness of his statement to police], petitioner must establish both

"that had the motion been filed, there was a reasonable probability that the evidence

would have been suppressed, and the outcome of the trial would have been different had

the evidence been suppressed."), *adopted*, 2010 U.S. Dist. LEXIS 61544 (E.D. Mich.

June 21, 2010) (unpublished).  Because the issue of voluntariness is critical to resolving

Spencer's ineffective assistance claim, the Court must analyze the voluntariness of the

statements as a threshold issue.  This will illuminate whether counsel's failure to seek

suppression mattered.

## 1.    *Voluntariness Standard*

"[T]he Fifth Amendment right against self-incrimination and the Due Process

Clause of the Fourteenth Amendment" require "that a confession be voluntary to be

admitted into evidence." *United States v. Dickerson*, 530 U.S. 428, 433, 120 S. Ct. 2326,

2330 (2000). As a corollary, "a confession cannot be used if it is involuntary." *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) (citation omitted); *cf. Miller v. Fenton*, 474 U.S. 104, 109, 106 S. Ct. 445, 449 (1985) ("On numerous [] occasions the Court has set aside convictions secured through the admission of an improperly obtained confession.") (citations omitted).

The "ultimate issue of voluntariness" – whether a trial court considered and ruled on it or, as here, it did not – is a legal question requiring independent federal review. *Miller*, 474 U.S. at 110, 112, 115-18, 106 S. Ct. at 449-51, 452-54 (holding that "the ultimate issue of 'voluntariness'" is not an issue of fact entitled to a presumption of correctness but rather a question of federal law requiring independent review). In assessing voluntariness, courts seek to determine "whether a defendant's will was overborne at the time he confessed[,]" *Reck v. Pate*, 367 U.S. 433, 440, 81 S. Ct. 1541, 1546 (1961), by examining the "totality of the surrounding circumstances[,]" *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047 (1973). "[B]oth the characteristics of the accused and the details of the interrogation[,]" are pertinent to the voluntariness analysis and specific factors for consideration include the age, education, and intelligence of the defendant, the defendant's physical and mental state, whether the defendant has been informed of his *Miranda* rights, the length of questioning, the repeated and prolonged nature of the questioning, and the use of physical punishment, such as deprivation of food or sleep. *Id.*; *see also Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 1754 (1993). The burden rests with the State to prove

voluntariness by a preponderance of the evidence.  *Abela v. Martin*, 380 F.3d 915, 928

(6th Cir. 2004).

**2.      *Application of Voluntariness Standard to the Instant Case***

Although the trial court held no hearing[5] and made no explicit findings on the

voluntariness of Spencer's statements, the Court concludes that "it is apparent from the

record" that the statements at issue were involuntary.  *Mincey v. Arizona*, 437 U.S. 385,

397 n.12, 98 S. Ct. 2408, 2416 n.12 (1978); *Beecher v. Alabama*, 389 U.S. 35, 37-38, 88

S. Ct. 189, 190-191 (1967) (per curiam) (although the trial court held no hearing, it heard

evidence on the voluntariness of a hospital statement at trial and at hearing on post-trial

motions and as such, the Court could make a determination of voluntariness on the record

before it).  Thus, Spencer's trial counsel would have prevailed had he filed a motion to

suppress the hospital statements.

**a.      *Facts Surrounding February 10 Interview***

At the time Proudfoot questioned Spencer on February 10, Spencer remained in

intensive care and was in a profoundly deteriorated physical and mental state that left him

susceptible to coercion and lacking in free will.  The night before this interview, Spencer

was injected with both Haldol and Demerol.  (List of Medications Administered by Day,

Pet., App. G.)  On the morning of the interview, Spencer received two more doses of

---

[5] In Michigan, *Walker* hearings are held to determine the admissibility of confessions. *People v. Walker*, 376 Mich. 331, 132 N.W.2d 87 (1965).  No hearing was held in the instant case despite Michigan precedent explaining that a defendant's "weakened mental and physical state" may constitute "an alerting circumstance . . . which should have triggered the court's *sua sponte* inquiry into the voluntariness of the statement."  *People v. Hooks*, 112 Mich. App. 477, 482, 316 N.W.2d 245, 247 (1982).

Haldol. (*Id.*)  Between his initial hospitalization on January 30 and the first interview, Spencer had undergone two surgeries.  On February 1, surgeons removed a large amount of carbonaceous material from his lungs. (2/28/06 Trial Tr. at 124-25.)  On February 7, doctors performed a debridement, skin surgery where Spencer's deeply burnt skin was removed to the point of bleeding. (*Id.* at 95-100.)  Moreover, Spencer did not learn of his girlfriend's death until February 9. (*Id.* at 54.)

Given the various statements by Spencer's sister Coreen, who was present during this interview, regarding medications and the fact that the interview, lasting over an hour, was interrupted due to Spencer's IV becoming dislodged on several occasions, Proudfoot knew or should have known that Spencer was heavily medicated.  While Spencer's treating nurse, Ben Coppens, told Proudfoot the types of medications given to Spencer, Proudfoot never inquired into the effects of these drugs. (2/28/06 Trial Tr. at 70-71, 104.)

Nurse Coppens allowed Proudfoot to speak with Spencer on February 10;[6] however, his testimony indicated that he would not have permitted Proudfoot to speak with Spencer had he known the questioning was going to be accusatory and he explained that he gave his permission because he hoped it would help Spencer sort through what happened and get closure about his girlfriend's death. (2/28/06 Trial Tr. at 59-61.) Coreen testified that Proudfoot seemed interested in seeking information about the fire's origin. (2/27/06 Trial Tr. at 130.)  Proudfoot never administered *Miranda* warnings or

---

[6] Nurse Coppens violated hospital policy by failing to seek permission for the interview from a physician or from Spencer himself. (2/28/06 Trial Tr. at 58-59.)

26

otherwise explained to Spencer that he was a potential suspect; however, Proudfoot did record the entire conversation without informing Spencer.  Given Proudfoot's demeanor, no one present – Coreen, Nurse Coppens, nor Spencer – understood that Proudfoot was seeking to elicit statements from Spencer to use against him.

       b.     *Facts Surrounding February 12 Interview*

The incriminating statements derived from the far more accusatory interrogation on February 12, at which only Proudfoot and Spencer were present, occurred just a day after a third major post-fire surgery, and were elicited without permission from any medical staff, are even more clearly a product of coercion that those made on February 10.  On February 12, Spencer was recovering from skin grafting surgery conducted the day before.[7]  This was his third major surgery since being admitted in the hospital and his "condition was still serious enough that he was in the intensive care unit."  *Abela*, 380 F.3d at 928.   Spencer was given Demerol twenty minutes before Proudfoot began interrogating him, one of seven doses – combined with four doses of the psychotropic drug Haldol – he received since the previous day's surgery.  (2/28/06 Trial Tr. at 95, 101-02.)   This interview lasted for more than ninety minutes and Proudfoot again recorded the entire conversation without informing Spencer.

       c.     *Analysis*

A hospitalized defendant may be able to give a voluntary statement.  *Johnson v. Havener*, 534 F.2d 1232, 1233 (6th Cir. 1976) (no coercion where interrogation was

---

[7] During this session, Proudfoot had to tell Spencer to stop "pulling [his] skin off" from the grating surgery.  (Tr. Feb. 12 Interview 35.)

conducted with doctor's permission although suspect was hospitalized and was being treated with drugs).  However, the confession of a critically wounded defendant who was in an intensive care unit was held to be inadmissible in *Mincey*.  437 U.S. 385, 98 S. Ct. 2408.  Thus, it is the particular facts and circumstances of the case that matter. The Sixth Circuit has "expressed concern about the voluntariness of a confession made by a mentally impaired criminal defendant when that impairment is known to police, noting '[w]hen a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to interrogating officers, a lesser quantum of coercion is necessary to call a confession into question.'"  *Murphy v. Ohio*, 551 F.3d 485, 514 (6th Cir. 2009) (quoting *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002) (internal quotation marks and citation omitted)); *United States v. Murphy*, 763 F.3d 202, 205 (6th Cir. 1985) (suspect's "physical condition and emotional state at the time of the confession" are relevant to voluntariness).  Courts in Michigan have demonstrated similar concern.  *See, e.g.*, *People v. Hooks*, 112 Mich. App. 477, 481-82, 316 N.W.2d 245, 247 (1982) (explaining that a defendant's incriminating statement made approximately eight hours after being seriously wounded while in the hospital, on pain medication, and with tubes attached to his body evidenced defendant's weakened mental and physical state and constituted an alerting circumstance which should have triggered a *sua sponte* inquiry into the voluntariness of the statement).

        This concern is driven by two principles.  First, mentally impaired suspects are less capable of making a free decision about whether to speak with police.  *Hill*, 399 F.3d at 683 (("A suspect's 'mental condition is surely relevant to an individual's susceptibility

28

to police coercion.'") (quotation omitted).  Secondly, police may use subtle, friendly

forms of coercion to elicit incriminating responses through interrogation of suspects

known to be impaired, particularly those who are hospitalized.  *Murphy*, 551 F.3d at 513

("'[I]nterrogators have turned to more subtle forms of psychological persuasion,'

resulting in greater emphasis being placed on the defendant's mental condition when

determining the voluntariness aspect of a confession." (quoting *Connelly*, 479 U.S. at

164, 107 S. Ct. at 520 (1986))); *United States v. LeShore*, 543 F.3d 935, 940-41 (7th Cir.

2008) ("[W]hen the interrogating officers reasonably should have known that a suspect is

under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to

call into question the voluntariness of the confession."); *Hooks*, 112 Mich. App. at 482,

316 N.W.2d at 247 ("[I]n many ways the subtle, friendly coercion that can be exerted on

one who is helpless and seriously wounded in a hospital room is more effective than

offers of leniency, in rendering one's statements involuntary.").

    Under such conditions, then, the administration of *Miranda* warnings is critical to

the voluntariness of a defendant's statements.[8]  *Murphy*, 551 F.3d at 514-15 (defendant's

mental limitations insufficient to establish involuntariness where defendant was given

*Miranda* warnings, signed a waiver of his rights, and demonstrated an understanding of

the "gravity of the situation in which he found himself"); *Abela*, 380 F.3d at 928

(deeming hospital-bed and subsequent police station confession voluntary

---

[8] In setting forth the warnings to be given to suspects prior to custodial interrogation, the
*Miranda* Court predicted that "this warning may serve to make the individual more
acutely aware that he is faced with a phase of the adversary system – that he is not in the
presence of persons acting solely in his interest."  384 U.S. at 469, 86 S. Ct. at 1625.

notwithstanding suspect's broken nose and hangover because he was not drunk or otherwise impaired at the time of the confession and was given full *Miranda* warnings); *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000) (affirming district court's denial of habeas petition based on involuntary hospital confession where suspect was given full *Miranda* warnings, sheriff received permission from hospital staff prior to questioning, and trial court credited testimony that the suspect understood what she was saying); *United States v. Newman*, 889 F.2d 88, 91, 95 (6th Cir. 1989) (deeming suspect's confession voluntary despite his "chronic alcoholism" and potential "Acute Brain Syndrome" which may have interfered with understanding the significance of the interrogation, where suspect was given full *Miranda* warnings and signed a printed waiver form, as well as the agents' later transcription of the confession); *Pea v. United States*, 397 F.2d 627, 634 (D.C. Cir. 1968) (en banc), *disapproved on other grounds*, *Lego v. Twomey*, 404 U.S. 477 (1972); *see also Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 1425 (1969) (a warning of constitutional rights is a circumstance quite relevant to a finding of voluntariness) (citation omitted).

In the instant case, Proudfoot knew or should have known that Spencer was heavily medicated but never even sought to discover the effects of the various medications.  (2/28/06 Trial Tr. at 70-71, 104.)  Despite being on notice that Spencer was heavily-medicated, connected to tubes and IVs in an intensive care burn trauma unit, Proudfoot never administered formal warnings to Spencer despite evidence in the record suggesting that Spencer was a suspect in Proudfoot's mind as early as February 10.  This evidence includes the fact that Proudfoot recorded the conversation without informing

Spencer and asked questions toward the end such as, "[Is] there any possibility that you

started the fire even accidentally and just don't remember it?"  (Tr. Feb. 10 Interview,

Side 2, at 4.)  By the time of the February 12 interrogation, Proudfoot had searched

Spencer's house and found physical evidence that was allegedly inconsistent with

Spencer's February 10 account of the fire.  He confronted Spencer with this evidence on

February 12.

    In light of the record evidence, the State cannot demonstrate that Spencer, who

was heavily medicated and remained in intensive care, understood the gravity of the

situation.  The evidence points to the contrary.  Proudfoot warned Spencer that "juries

think" that dying by fire is "a terrible, terrible way to go."  (Tr. Feb. 12 Interview 35.)

Spencer paused and said "I know I didn't set the fire." (*Id.*)  Despite aggressive

questioning, it was not until Proudfoot responded by saying "That's not true Fred.  And

you know it's not true," (*id.*), that Spencer finally realized he was being accused and

stated his belief that he needed the assistance of counsel.[9]  When officers use subtle

techniques demonstrating an "undeviating intent . . . to extract a confession," the

"confession must be examined with the most careful scrutiny."  *Spano v. New York*, 360

U.S. 315, 324, 29 S. Ct. 1202, 1207 (1959).  The lack of warnings supports a finding that

Proudfoot acted deliberately elicited damaging testimony from a heavily-medicated and

wounded suspect through subtle means of coercion.  Because Spencer was particularly

---

[9] That Spencer asked for counsel at the end of the interview does not negate a finding that
the statements up until that point were voluntary.  In fact, the hospital interrogation in
*Mincey* ended in the same fashion – when the police asked Mincey, "did you shoot
anyone?" he responded by saying "I can't say, I have to have a lawyer."  437 U.S. at 401
n.16, 98 S. Ct. at 2418 n.16.

susceptible to pointed questioning about the fire given his physical and mental state and lacked a meaningful understanding of the nature of the questioning or the consequences of his answers, Proudfoot's failure to make the situation clear to Spencer through formal warnings was a coercive circumstance.

Similarly coercive given the totality of the circumstances was Proudfoot's lie to Spencer. Proudfoot told Spencer that Tracy, a witness to the fire, said that she saw Spencer was burned when she saw him near the street outside of the burning house. (2/22/06 Trial Tr. at 108.) In fact, Tracy had told Proudfoot that Spencer was *not* burned when she saw him, before he went into the house for a second time, and Proudfoot admitted his statement to the contrary was a lie. (2/21/06 Trial Tr. at 49; 2/22/06 Trial Tr. at 108.) While lies, without more, do not make an otherwise voluntary statement involuntary, they are relevant. *Frazier v. Cupp*, 394 U.S. at 739, 89 S. Ct. at 1425. Here, the lies are relevant because they underscore Proudfoot's accusatory agenda and the concealment of that agenda from a wounded and heavily-medicated suspect.

That Spencer had taken painkillers "before being questioned by law enforcement is just one factor among many to be considered under the 'totality of the circumstances' test for voluntariness." *United States v. Abdulmutallab*, No. 10-20005, 2011 U.S. Dist. LEXIS 105462, at *10-11 (E.D. Mich. Sept. 16, 2011) (unpublished) (citing *United States v. Martin*, 781 F.2d 671, 674 (9th Cir. 1985) (affirming conclusion that defendant's statements were voluntary despite administration of Demerol while hospitalized)). Demerol, however, has been recognized by some courts as fatal to a suspects' ability to make a free determination to incriminate themselves in response to interrogation. *See,*

*e.g.*, *Jackson v. Denno*, 378 U.S. 368, 373 n.3, 87 S. Ct. 1774, 1778 n.3 (1964) (noting

physician's testimony that Demerol makes a patient "dopey"); *Hanna v. Price*, 245 F.

App'x 538, 540 (6th Cir. 2007) (*Miranda* waiver involuntary where suspect "was

medicated with Demerol and other drugs").  Haldol, an "anti-psychotic drug," like

Demerol, is "serious medication" and both are "mind-altering medications [that] can

cause sedation," "affect [one's] ability to think, to be reliable, and to process

information," "to judge properly, to follow through with things and also to perceive what

is told to [those taking the medications."  (2/28/06 Trial Tr. at 132, 140-41.)

Although Spencer's last dose of Demerol was the night before the February 10

interrogation, trial testimony established that the side effects may linger and would be

exacerbated by physical trauma, alcohol withdrawal, and by the simultaneous ingestion

of other drugs, which on February 10, included Haldol, Tylenol 3 with codeine – a

Schedule 3 opiate affecting judgment and alertness, Benadryl, and Ativan, an anti-anxiety

drug potentially inducing drowsiness and a feeling of being high or floating.  (*Id.* at 141;

2/24/06 Trial Tr. at 57-58, 61, 63-64, 70, 71-72, 76.)  Defense expert Dr. Marvin Bleiberg

testified at trial that he would not have sought consent from Spencer for any medical

procedure while he was under the influence of this potent drug cocktail "because the

patient probably doesn't understand and he probably can't answer with any good

judgment."  (2/28/06 Trial Tr. at 147-48.)

With respect to the February 12 interview, Spencer was administered a dose of

Demerol a mere twenty minutes before Proudfoot began questioning him.  Spencer's

treating surgeon, Dr. Cabrera, testified that Spencer was "under the influence" at the time

of the interrogation. (*Id.* at 105.) Dr. Bleiberg testified that Spencer was "impaired," that "Demerol is a narcotic," and that he "would not consider anything someone would say during that time period as being reliable." (*Id.* at 144-45.) The information would be unreliable because under the circumstances, "somebody can be easily confused, easily misled." (*Id.*)

In addition to the administration of various medications, many of Spencer's responses to Proudfoot's questions were incoherent. The fact that Spencer may have appeared lucid at times during the course of the interrogations is not dispositive. *See, e.g.*, *Griffith v. Rhay*, 282 F.2d 711, 715 (9th Cir. 1960) (finding a statement involuntary where defendant was given a dose of Demerol five minutes before the interrogation even though he appeared "coherent and readily answered questions"). While the State argues that "[n]o one testified that [Spencer] was confused during the interviews," (Answer at 45), the record evidence suggests otherwise. For example, Spencer's sister Coreen testified that although Spencer "could talk," what he was saying "didn't make sense" and that "the things he said just didn't make sense with what sounded reasonable or what I knew about things from the house." (2/27/06 Trial Tr. at 122.) Spencer appeared confused when he stated that his dog was probably under the bed when they found him, even though the dog survived the fire and was with Spencer when he spoke with an eyewitness outside. (Tr. Feb. 10 Interview, Side 1 at 6, 19.)

The confused and perhaps contradictory answers are partially explained by the possibility of confabulation. During the February 10 interview, Coreen Spencer told Proudfoot "And I mean, he, he does confabulate. I mean, if he doesn't have an answer . .

34

. .” (Tr. Feb. 10 Interview, Side 2, at 15.)  Dr. Bleiberg testified that a person who shared

Spencer's characteristics, of having a head injury,[10] post-traumatic stress disorder, and a

long-term alcohol addiction could be susceptible to confabulation, in which a person is

compelled to make up answers to questions or fill in facts.  (2/28/06 Trial Tr. at 134-38

150; *see also* 2/27/06 Trial Tr. at 124 (testimony of Coreen Spencer regarding

confabulation).)

Moreover, some of Spencer's statements were simply nonsensical.  During the

February 10 interview, Spencer stated "Once in a while [Kathy will] have scented

[candles] . . . [inaudible] people bringing shoes and once in a while somebody'll bring in

some businessman will bring in a box of dish soap that would just be sitting out there in a

free [pile].  First come, first serve . . . for fifteen dollars you get seventy dollars worth of

food stamps."  (*Id.* at 22.)  During the February 12 interrogation, Proudfoot asked

Spencer how full of flames a room in the house was and Spencer responded by saying,

"You, you're yellow and green." (Tr. Feb. 12 Interview 8-9.)  Earlier in the same

discussion, Spencer stated: "In fact I was just looking for my clothes.  I must not have

had pants on.  I must have had pants on cause my wallet was with me.  That's what I'm

doing right now is drying out my wallet and stuff . . . .  But I musta been wearing pants . .

. . [U]sually I wear, I'm wearing [inaudible] my underwear with my wallet.  You know

that doesn't make sense."  (*Id.* at 2-3.)  When Proudfoot asked Spencer whether he saw a

fire in the garage after hearing a bang, Spencer launched into an unresponsive answer

about "a million people com[ing] in, customers coming through."  (*Id.* at 27.)

---

[10] Spencer's head injury occurred in an automobile accident when he was a teenager.

The Court notes that the factors used to assess the "totality of the circumstances" in a voluntariness inquiry do not constitute a "mandatory checklist" that must be present in order to find a statement involuntary. *United States v. Brown*, 557 F.2d 541, 548 n.5 (6th Cir. 1977). Rather, it is the "presence of factors indicating an overbearance of an accused's will which is significant and not the absence of other factors which may be irrelevant to the defendant's claim or to the circumstances surrounding the particular confession." *Id.* Here, Spencer's weakened physical and mental state, of which Proudfoot was aware, coupled with Proudfoot's subtly coercive tactics render the statements involuntary. The Court believes that the facts that Spencer is not youthful and was not deprived of food or sleep, are non-factors rather than factors suggesting voluntariness.

### 3.    *Impact of the Admission of the Statements on Spencer's Trial*

To show prejudice resulting from Spencer's trial counsel's deficient performance, Spencer must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In determining the effect on the outcome of a confession's admission, the Sixth Circuit looks to the "overall strength of the government's case;" the "relationship between the confession and other evidence; the evidentiary value of the confession;" the "emphasis placed on the confession within the government's case; and the defendant's opportunity to attack the confession through cross-examination." *Eddleman v. McKee*, 471 F.3d 576, 586 (6th Cir. 2006), *overruled on other grounds*, *Vasquez v. Jones*, 496 F.3d 564 (6th Cir. 2007).

Without Spencer's statements, the State's evidence of Spencer as the arsonist responsible for the fatal fire was weak.  Spencer was not charged with the crime for five years and the State presented neither eyewitness testimony identifying Spencer as starting the fire nor strong evidence that would explain why Spencer would kill his girlfriend and burn his uninsured house.[11]  The statements were effectively the prosecution's only direct evidence that Spencer committed the crimes of which he was convicted.  The State's evidence of arson consisted of a gas can, a piece of wood, matches found near the water heater in the basement of the home, and the fact that the car in the garage had doors that were slightly ajar and the gas cap had been removed.  A different view of this evidence was explained by an arson expert at trial.  (2/24/06 Trial Tr. at 130; 3/1/07 Trial Tr. at 78, 98-110, 105-06, 115-118, 217-18.)  Some of the minimal evidence that did support the State's case was rebutted or contradicted by other evidence.  For example, the State argued that Spencer's facial burns resembled flash burns that could have been caused by starting the water heater fire.  However, Tracy, an eyewitness who saw the fire and Spencer while driving past the house, testified that Spencer had no burns on his face when she saw him, which would have been after he allegedly set the fire or fires.  (2/15/06 Trial Tr. at 232, 244.)  Similarly, prosecution witness Jeff Gordon – a firefighter and nurse with burn unit experience – conceded that Spencer's burns were not consistent with a flash burn.  (*Id.* at 178.)

---

[11] Spencer allowed his insurance policy to lapse in August 1999.  (2/27/06 Trial Tr. at 205.)  Moreover, while the State presented some speculative testimony that Sytek was planning to leave Spencer, (2/15/06 Trial Tr. at 104, 117), other evidence showed that although the couple fought, particularly when inebriated, the couple loved each other and got along most of the time (2/27/06 Trial Tr. at 182, 193, 197; 2/23/06 Trial Tr. at 177).

With respect to "the evidentiary value of the confession[,]" *Eddleman*, 471 F.3d at

586, the Court notes that:

> A confession is like no other evidence.  Indeed, 'the
> defendant's own confession is probably the most probative
> and damaging evidence that can be admitted against him . . . .
> [T]he admissions of a defendant come from the actor himself,
> the most knowledgeable and unimpeachable source of
> information about his past conduct.  Certainly, confessions
> have a profound impact on the jury[.]'

*Moore v. Berghuis*, 700 F.3d 882 (6th Cir. 2012) (page numbers not yet available)

(quoting *Arizona v. Fulminate*, 499 U.S. at 296, 111 S. Ct. at 1257 (alteration in

original)).  The Michigan trial court noted in its post-trial order that "[a]ll of the evidence

to support [Spencer's] conviction is circumstantial," save the hospital-bed statements.

Op. & Order, *Spencer*, No. 05-59-FC, at 3. The Sixth Circuit recognizes that a confession

is particularly likely to be outcome-determinative where it is the "only piece of direct

evidence" to prove a defendant's involvement in the crime.  *Kordenbrock v. Scroggs*, 919

F.2d 1091, 1099 (6th Cir. 1991) (citation omitted).  This premise, coupled with the fact

that "[t]he bulk of the prosecution's evidence stem[med] from [Spencer's] statements that

he made in St. Mary's Medical Center on February 10 and 12, 2000[,]" leads this Court

to conclude that counsel's failure to exclude the hospital statements prejudiced Spencer.

Op. & Order, *Spencer*, No. 05-59-FC, at 4.

The statements were damaging and the prosecution emphasized the statements

throughout Spencer's trial.  *Hanna*, 245 F. App'x at 543 (finding significant that

prosecutor "dwelled on" statement in closing argument); *Eddleman*, 471 F.3d at 587

(noting that prosecutor made the confession the "centerpiece of this case") (quoting

38

*Fulminate*, 499 U.S at 297, 111 S. Ct. at 1258).  The statements were incriminating

because the factual inconsistencies contained throughout allowed the State to support its

contention that Spencer was lying.  The state trial court noted the inconsistencies of the

statements and the physical evidence when it noted that "[w]hen matched with the

physical evidence," the jury could "conclude that Defendant was lying[.]"  Op. & Order,

*Spencer*, No. 05-59-FC, at 4. Moreover, the statements were used as an inference of guilt

because Spencer did not vehemently deny Proudfoot's accusations that he started the fire

and killed his girlfriend and Spencer's equivocal responses could easily be construed as

evidence of guilt.[12]  For instance, when Proudfoot told Spencer that "That fire was not an

accidental fire," Spencer paused and then said "Don't know what to tell ya."  (Tr. Feb. 12

Interview 28.)  Similarly, when Proudfoot attempted to clear up whether Spencer wanted

to kill his girlfriend, Spencer responded by saying "Why'd I kill Cathy? Why do I want to

kill Cathy?" and "wouldn't it be kinda dumb if I was goin to burn the house . . . a couple

a days before I could put insurance on it?  I mean."  (*Id.* at 28-29.)

**4.**     ***Summary of Prejudice Prong***

        The Court finds that the weakness of the State's case, the persuasive evidentiary

value of the Spencer's statements, and the State's heavy reliance on Spencer's statements

as evidence of guilt bolster a finding of prejudice caused by trial counsel's failure to file a

---

[12] During the State's opening, the prosecutor told the jury that they would hear Spencer's statements, stating "One thing that's going to be real telling when you hear the recordings is – you got to think to yourself what are the things that you would expect people to say in the situation he is in."  (2/15/06 Trial Tr. at 29.)  Nearly twenty pages of transcript were dedicated to explaining to the jury why Spencer's statements were illustrative of his guilt.

motion to suppress the hospital statements. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 1269 (indicating that a verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support); *see also Berghuis*, 700 F.3d 882 (6th Cir. 2012) (page numbers not yet available) (determining that admission of a custodial statement in violation of defendant's right to counsel was not harmless error when "[t]he prosecution presented no direct evidence, only circumstantial evidence, linking [petitioner] to the scene of the crime"); *Poindexter v. Mitchell*, 454 F.3d 564, 582 (6th Cir. 2006) (concluding that "[p]etitioner's defense was not prejudiced" because "[t]he evidence that Petitioner Poindexter killed Kevin Flanaghan was overwhelming"); *Hicks v. Collins*, 384 F.3d 204, 215 (6th Cir. 2006) (establishing that petitioner was not denied the effective assistance of counsel because "there was overwhelming evidence of . . . guilt" which precluded petitioner from "demonstrat[ing] that there is a reasonable probability that, but for counsel's errors, the factfinder would have reasonable doubt about his guilt" (internal citations and quotations omitted)); *United States v. Bavers*, 787 F.2d 1022, 1030 (6th Cir. 1985) (finding that "counsel's performance was not shown to have resulted in deprivation of an essentially fair trial especially in light of overwhelming proof" of defendant's guilt). The State's reliance on the statements from start to finish suggests that there is a reasonable probability that the statements affected the outcome of the trial.

## V.   CONCLUSION AND ORDER

For the reasons described above, the Court finds that Spencer's due process rights were violated and that he received ineffective assistance of counsel in violation of the

40

Sixth Amendment.  The decisions of both Michigan state courts finding otherwise were contrary to and were unreasonable applications of *Strickland*.

Accordingly,

**IT IS ORDERED** that Spencer's petition for a writ of habeas is **CONDITIONALLY GRANTED**.  Spencer shall be released from state custody unless the State of Michigan commences a new trial within 180 days of the entry of final judgment in this case.


Dated: February 6, 2013

s/PATRICK J. DUGGAN<br>UNITED STATES DISTRICT JUDGE

Copies to:

**Sarah C. Zearfoss**
**Linus R. Banghart-Linn**